IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICK BUTLER, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 22-cv-3252 |
| | : | |
| DAVD PENCHISHEN, et al., | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**CRAIG M. STRAW**                                        **September 27, 2024**
**UNITED STATES MAGISTRATE JUDGE**

On August 11, 2022, Plaintiff Patrick Butler ("Butler" or "Plaintiff") filed a civil

complaint against Defendants, David Penchishen, Christopher Gephardt, and Northampton

County (collectively "Defendants").[1]  Before this Court is Defendants' motion for summary

judgment on Plaintiff's First Amendment and Fourteenth Amendment claims brought pursuant to

42 U.S.C. § 1983 and Plaintiff's Religious Land Use and Institutionalized Persons Act

(RLUIPA) claim.[2]  Doc. 46.  Plaintiff filed a response.  Doc. 49.  Defendants did not file a reply.

For the following reasons, Defendants' motion of summary judgment (Doc. 46) is hereby

**GRANTED**.

I.      **PROCEDURAL HISTORY**

Plaintiff was a pretrial detainee at Northampton County Prison ("NCP") and filed a pro se

civil suit asserting claims pursuant to 42 U.S.C. § 1983 for violations of his First, Fifth, Eighth,

and Fourteenth Amendment rights, a Monell[3] claim, and a Religious Land Use and

---

[1] The listed defendants are the remaining defendants still involved in this matter.  All other
defendants were terminated from the docket via order.  Doc. 8.
[2] It is uncontested that these issues are the only remaining unresolved issues in this matter.
[3] Monell v. Dept. of Soc. Serv. of City or N.Y., 436 U.S. 658 (1978).

Institutionalized Persons Act (RLUIPA) claim against Defendants.  Doc. 2, at 3-4.[4]  On

September 26, 2022, all of Plaintiff's claims were dismissed without prejudice except for

Plaintiff's Free Exercise and Equal Protection claims, and Plaintiff's RLUIPA claim against

Defendant Northampton County, which the Court limited to injunctive relief only.  Doc. 6.

These claims are based on the denial of Jumu'ah services during Plaintiff's incarceration.  Doc.

2.  Plaintiff asserts that he is Muslim, and it is his sincerely held belief that he was required to

attend weekly group prayer known as Jumu'ah.  Doc. 2.  Plaintiff claims that Defendants denied

him Jumu'ah services under the guise of COVID-19 restrictions but allowed other religious and

nonsecular group gatherings.  Doc. 2.

Defendants move for summary judgment on all remaining claims.  Doc. 49.  Defendants

first argue that the restrictions on group religious services was reasonably related to a legitimate

penological interest because the restriction was in place to protect the prison from the spread of

COVID-19.  Doc. 46-3, at 9.  Additionally, Defendants argue that after attempting to secure an

Imam to provide services, no Imams were available or willing to enter the prison to provide

religious services.  Id. at 10-11.  Defendants also note that the disruption in services was short-

term and constitutionally permissible.  Id. at 12.  Defendants also assert that qualified immunity

applies to Defendants Penchishen and Gephardt because there were no constitutional violations.

Doc. 46-3, at 17-19.  Lastly, Defendants argue that Plaintiff cannot establish a RLUIPA violation

because Defendants could not accommodate Plaintiff's request without jeopardizing the health

and safety of everyone involved, and no Imams were available to provide services.  Id. at 19.

---

[4] All pin cites for CM/ECF documents refer to the CM/ECF pagination generated at the top of
the page.

Plaintiff responded to the summary judgment motion.  Doc. 49.  Plaintiff argues that Defendants were allowing group meetings and religious group services during his incarceration despite the COVID-19 policy.  Id. at 2.  Plaintiff cites the visitor's logs from NCP to demonstrate that individuals were signing in for group meetings, both religious and nonsecular.  Id.  Plaintiff also contends that Defendants did not contact any Imams or attempt to secure services for Muslim inmates.  Id.  On June 11, 2024, the Court held oral argument on Defendants' summary judgment motion.  All parties attended oral argument.  The case is now ripe for disposition.

## II.   <u>LEGAL STANDARD</u>

Motions for summary judgment are governed by Fed. R. Civ. P. 56(a).  The court shall grant summary judgment if "the *movant* shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Id. (emphasis added).  A fact is material if the fact is proof of an essential element of the claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see Armano v. Martin, 157 F.Supp.3d 392, 400 (Jan. 15, 2016) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)) (alteration in original quotation marks) ("A fact is 'material' if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.").  An issue is "genuine" if, after reviewing the evidence, a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 248.

After the moving party has demonstrated no genuine issue of material fact exists, the nonmoving party must provide evidence that would support a jury verdict or specific facts showing a genuine issue for trial.  Armano, 157 F.Supp.3d at 400 (citing Celotex Corp., 477 U.S. at 323); see Celotex Corp., 477 U.S. at 324 (providing nonmoving party required to go beyond pleadings and use affidavits, depositions, answers to interrogatories, and like to prove genuine issue).  To establish a fact is genuinely disputed the party must:

> [cite] to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits
> or declarations, stipulations (including those made for purposes of
> the motion only), admissions, interrogatory answers, or other
> materials; or [show] that the materials cited do not establish the
> absence or presence of a genuine dispute, or that an adverse party
> cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A)-(B).  When considering summary judgment motions, the court

evaluates the facts in the light most favorable to the nonmoving party.  InterVest, Inc. v.

Bloomberg, L.P., 340 F.3d 144, 160 (3d. Cir. 2003).  However, "[t]he mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff."  Anderson, 447 U.S. at 252.

After considering all party submissions, Rule 56(c) mandates the entry of summary judgment:

> against a party who fails to make a showing sufficient to establish
> the existence of an element essential to that party's case, and on
> which that party will bear the burden of proof at trial. In such a
> situation, there can be 'no genuine issue as to any material fact,'
> since a complete failure of proof concerning an essential element of
> the nonmoving party's case necessarily renders all other facts
> immaterial.

Celotex Corp., 477 U.S. at 322-23 (alteration in original quotation marks).  Thus, the moving

party would be entitled to judgment as a matter of law.  Id.

## III.   DISCUSSION

### A.  Undisputed Facts

NCP is a county prison facility located in Easton, Pennsylvania.  Doc. 2, at 3-4.  Butler

was incarcerated at NCP for approximately five months between June 2022 and November 2022.

Doc. 46-2, at 14; Doc. 49, at 2.  Butler is Muslim and was an actively practicing Muslim during

his incarceration.  Doc. 46-2, at 14, 21.  Butler claims that he was denied group worship service,

known as Jumu'ah, during his five-month incarceration while other religious and nonsecular

groups met for services.  Doc. 2, at 5.5; Doc. 46-2, at 2, 21.  Jumu'ah is a weekly Muslim congregational service, commanded by the Quran, that must be held every Friday after the sun reaches its zenith and before the Asr (afternoon prayer).[5]  Doc. 49 at 2; Doc.46-3, at 2-3.

Defendant David Penchishen ("Defendant Penchishen") was the warden of NCP during Butler's incarceration.  Doc. 46-2, at 42.  Defendant Penchishen, while responsible for the overall operation of NCP, was not directly involved in coordinating religious services and delegated that responsibility to Defendant Christopher Gephardt ("Defendant Gephardt").  Id.; Tr. of Oral Arg. at 4 (June 11, 2024).  Defendant Gephardt was the full-time volunteer services coordinator at NCP.  Doc. 46-2, at 42.  Gephardt was responsible for coordinating the services listed in NCP's Inmate Handbook Section 803.  Id. at 42-43.  Section 803 provides:

> Regular religious services are held for the Protestant, Muslim and Catholic faiths. Other faiths also have observances at scheduled times. Spiritual advisors may visit the institution to meet with and instruct members of the various faiths. If you do not have a particular spiritual advisor and wish to be seen by one, please contact the chaplain and a one-on-one service will be established. Schedules of various religious services and observances will be posted on the housing area bulletin boards.

Id. at 47.

During Butler's incarceration, NCP was under COVID-19 restrictions.  Doc. 46-2, at 50; Doc 49, at 2.  The COVID-19 restrictions were implemented to prevent the spread of COVID-19 infection to administrators, guards, and inmates.  Doc. 46-2, at 42, 50.  Defendants provided affidavits noting that all group activities, religious or nonsecular, were prohibited under the COVID-19 restrictions during Butler's incarceration.  Id.; Doc 49, at 2.  Plaintiff claims that group activities were occurring at NCP during this time despite the COVID-19 procedures, but

---

[5] See O'Lone v. Estate of Shabazz, 482 U.S. 342, 345 (1987)

Jumu'ah services were not provided.  Doc. 49, at 2.  Butler, however, did not personally witness any religious group services taking place at NCP.  Tr. of Oral Arg. at 25.  Under the COVID-19 restrictions inmates were allowed one-on-one religious services and all other forms of religious practice, i.e., individual prayer, religious study, etc.  Doc. 46-2, at 3, 25, 51.

Butler requested one-on-one services with an Imam.  Id. at 44, 51.  During Butler's incarceration, however, no Imams were available to provide services to NCP inmates.  Id. at 15, 52-55.  To assist in finding an Imam to provide services at NCP, Butler gave Defendant Gephardt the names of Imams he believed would be willing to provide services.  Id. at 50; Tr. of Oral Arg. at 27-30.  Defendant Gephardt contacted the Imams provided by Butler but was unsuccessful in securing services for NCP.  Id.; Doc. 46-2, at 56-59.  Butler also independently attempted to secure an Imam for religious services but was also unsuccessful.  Doc. 46-2, at 18-19.  Butler then filed grievances regarding religious accommodations and was advised that the NCP was willing to make an accommodation for a one-on-one visit with an Imam.  Id. at 51. Nevertheless, no one-on-one visits occurred after Butler's grievances were filed because Defendant Gephardt nor Butler could secure an Imam.  Tr. of Oral Arg. at 27-28.

**B.      42 U.S.C. § 1983[6]**

Under 42 U.S.C. § 1983, an individual may seek redress for the deprivation of their rights, privileges, or immunities secured by the Constitution and laws, committed by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).  To "act under color of state law" the defendant must have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed within the authority of state law."  Id. (citing

---

[6] The parties concede that Butler exhausted all of his remedies available through prison grievances before filing his § 1983 claim.

United States v. Classic, 313 U.S. 299, 326 (1941).  Generally, state employment is sufficient to render the defendant a state actor.  Id. at 49 (citing Lugar v. Edmondson Oil Co., Inc. 457 U.S. 922, n.18 (1982)).  Thus, a state or public employee acting in his official capacity or exercising his responsibility pursuant to state law is acting under the color of state law.  Id. at 50.

Under § 1983, the cause of action is limited to "state actions," as opposed to private conduct.  Lugar, 457 U.S. at 936-37.  A state action taken by a defendant is defined as a deprivation, "caused by the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor."  West, 487 U.S. at 49 (citing Lugar, 457 U.S. at 936); see Classic, 313 U.S. at 326 (the misuse of power, possessed by virtue of state law constitutes a state action); see also West, 487 U.S. at 49-50 ("It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State.").

A plaintiff, however, cannot maintain a §1983 suit against a defendant solely on the basis of respondeat superior; the defendant must have some personal involvement.  See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); see also Iqbal, 556 U.S. 662, 676 (2009) (explaining that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  In Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014), rev'd on other grounds by Taylor v. Barkes, 575 U.S. 822 (2015), the Court discussed two ways a defendant-supervisor may be liable for unconstitutional actions taken by their subordinates.  First, a supervisor may be liable if he or she "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused

[the] constitutional harm." Id. (quoting A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.,

372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)).  Second, "a supervisor may be

personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed

others to violate them, or, as the person in charge, had knowledge of and acquiesced in the

subordinate's unconstitutional conduct."  Id.

 The parties do not contest that the Defendants were acting under the color of state law

and engaging in state actions, making § 1983 applicable.  Defendants do, however, assert that

Defendant Penchishen is not liable for the actions of his staff via respondeat superior.  Doc. 46-3,

at 16.  Importantly, Plaintiff acknowledges that his claim against Defendant Penchishen is solely

based on respondeat superior.  Doc. 46-2, at 26.  Defendants have submitted affidavits from both

Defendants Penchishen and Gephardt providing that Defendant Penchishen was not involved in

coordinating religious services at NCP, and that all religious service coordination was delegated

to Defendant Gephardt.   Doc. 46-2, at 42, 49-51.  While Defendant Penchishen ensured that

appropriate religious accommodation policies were in place, all religious requests were

forwarded to Defendant Gephardt.  Id. at 42-44.

 Plaintiff does not claim that Defendant Penchishen implemented the COVID-19

restrictions with deliberate indifference to the consequences nor does he provide any evidence

that Defendant Penchishen was directly involved with coordinating religious service at NCP.

Thus, it is uncontested that Defendant Penchishen had no personal involvement in the

coordination of religious services, nor did he implement a policy with deliberate indifference to

its consequences.  Plaintiff additionally does not claim that Defendant Penchishen instructed

Defendant Gephardt to act unconstitutionally.  Even if Defendant Penchishen's subordinate did

act unconstitutionally[7], there is no dispute that Defendant Penchishen was not directly involved nor acted with deliberate indifference regarding religious service coordination or COVID-19 restriction implementation.  Defendants' request to dismiss Plaintiff's respondeat superior § 1983 claim against Defendant Penchishen with prejudice is GRANTED.

Additionally, absent a constitutional violation, Plaintiff's § 1983 claim cannot be sustained against the remaining Defendants.

### C.  First Amendment Religious Freedom

The First Amendment establishes the constitutional right to religious freedom and the exercise thereof.  U.S. CONST. amend. I.  This right extends to all individuals including convicted prisoners.  See Pell v. Procunier, 417 U.S. 817, 822 (1974); Cruz v. Beto, 405 U.S. 319 (1972). Lawful incarceration, however, can bring about the withdrawal or limitation of many constitutional rights.  See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citing Price v. Johnson, 334 U.S. 266, 285 (1948).  "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives…." Id. (citing Pell, 417 U.S. at 822-23).

"When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interest."  Turner v. Safley, 482 U.S. 78, 89 (1987).  The four factors to consider when determining whether a regulation is reasonably related to a legitimate penological interest are:

> (1) Whether there is a valid rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

---

[7] Notably, Defendants' implementation of NCP's COVID-19 restrictions to protect the health and safety of the inmates, guards, and administration did not violate Plaintiff's constitutional rights.  See infra pp. 9-15.  Thus, there is no unconstitutional subordinate action to sustain Plaintiff's § 1983 respondeat superior claim against Defendant Penchishen.

(2) Whether there are alternative means/other avenues of exercising the right that remain open to prison inmates;
(3) The impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and
(4) The absence of ready alternatives.

Turner, 482 U.S. at 89-90.  When assessing the validity of a regulation, courts should provide deference to the correction officials creating and implementing the regulations since correction officials are so closely intertwined with the day-to-day operations, they, at times, possess expertise the courts do not.  See Turner, 482 U.S. at 90 (citing Pell, 417 U.S. at 827); see also Washington v. Harper, 494 U.S. 210, 223-24 (1990).  To grant summary judgment there must be no genuine issue of material fact that the regulation was reasonably related to a legitimate penological interest.  See Anderson, 477 U.S. at 248.

To assert a successful § 1983 claim for a violation of a person's First Amendment right to religious freedom, in the context of an incarcerated plaintiff, the plaintiff must first prove that the belief is both sincerely held and religious.  Dehart v. Horn, 227 F.3d 47, 51 (3d. Cir. 2000); Turner, 482 U.S. at 89.  It is clear from the parties' submissions that Butler held a sincere religious belief and that Jumu'ah is a sincere religious activity within the Muslim faith.  Doc.46-2, at 14, 21; Doc.46-3, at 2-3; Doc. 49 at 2.  Both parties concede that Butler was a practicing Muslim before and during his incarceration.  Doc. 46-1 at 2; Doc. 49 at 2.  The U.S. Supreme Court, this Court, and the parties recognize that Jumu'ah is a weekly Muslim faith based congregational service that must be held every Friday after the sun reaches its zenith and before afternoon prayer.  See O'Lone, 482 U.S. 342, 345 (1987); Butler v. Penchishen, 2022 WL 4473590, at *2 n.3 (E.D. Pa Sep. 26, 2022); Doc. 46-1, at 2-3; Doc. 49, at 2.  Therefore, there is no dispute that Butler was a practicing Muslim and genuinely believed he must participate in Jumu'ah as required by his religion— a religious freedom protected by the First Amendment.

10

The Court must now determine, under the <u>Turner</u> factors, whether the regulation was reasonably related to a legitimate penological interest.  Defendants have shown that the first factor, whether there is a valid rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, weighs in Defendants' favor.  Both parties agreed that the purpose of the COVID-19 policy implemented at NCP was to protect the health and safety of inmates, guards, and administrators.  Doc. 46-2 at 19, 42.  Inmate health and safety is a legitimate governmental interest.  <u>See</u> <u>Johnson v. Kuhn</u>, No. 22-4453, 2022 WL 4288277, at *3 (Sept. 15, 2022) (noting, "courts . . . have found testing and quarantining inmates was a legitimate response to COVID-19. . . and the government had a legitimate interest in preventing the spread of the virus."); <u>Reynolds v. Bucks</u>, No. 93-2548, 833 F. Supp. 518, 521 (E.D. Pa. Oct. 1, 1993) (holding health, safety, and sanitation are legitimate governmental interest); <u>see also</u> <u>Washington v. Harper</u>, 494 U.S. 210, 225 (1990) (holding prison administrators have a legitimate interest in ensuring the safety of prison personal and prisoners).

Further, the policy's restriction on group gatherings is rationally related to the policy's goal of protecting the inmates' health and safety by preventing the spread of COVID-19.[8] Defendants submitted evidence that COVID-19 can be fatal and poses a significant threat to inmates and staff.  Doc. 46-2, at 4-5.  Defendant Penchishen's affidavit details that prisons are inherently high-risk settings for the transmission of infectious disease due to the close quarters and challenges of maintaining social distancing.[9]  <u>Id.</u> at 42-43.  <u>See</u> <u>Turner</u>, 482 U.S. at 90

---

[8] <u>See</u> CDC, About COVID-19 (Jun. 13, 2024) (detailing COVID-19 can spread via droplet transmission from one individual to another) https://www.cdc.gov/covid/about/index.html#:~:text=COVID%2D19%20spreads%20when%20an,eyes%2C%20nose%2C%20or%20mouth.

[9] <u>See</u> CDC, Respiratory Virus Guidance (Mar. 1, 2024) (noting distancing and home isolation as ways to prevent the spread of COVID-19) https://www.cdc.gov/respiratory-viruses/guidance/index.html; <u>see also</u> Doc. 46-3, at n.2 (citing Thomas Wolf, <u>Temporary</u>

(citing <u>Pell</u>, 417 U.S. at 827) (providing deference to prison officials when making regulations). Given the close proximity of inmates in a confined space, the policy's prohibition regarding group gatherings is rationally related to preventing the spread of COVID-19 from one inmate to another. Plaintiff does not provide contrary evidence demonstrating that group gatherings do not increase the risk of COVID-19 exposure, nor does he refute that the policy was rationally related to preventing the spread of COVID-19.

Butler provided in his response to Defendants' summary judgment motion, however, that other religious and nonsecular groups were allowed to participate in group activities despite the COVID-19 restrictions which would question Defendants' assertion that the restriction was implemented to prevent the spread of COVID-19. Doc 49, at 2. As evidence, Butler provided visitor's logs for a separate section of NCP that he alleges demonstrates that group activities were taking place. <u>Id.</u> at 5-12. However, Butler did not provide any further evidence to support his assertion that group meetings/activities were taking place. Additionally, he admits that he never observed religious group services taking place in his section of NCP. Tr. of Oral Arg. at 25. On the other hand, Defendants have submitted affidavits stating no group activities were taking place during the COVID-19 restrictions and maintain that the religious services listed on the logs were one-on-one services between inmates and clergy in compliance with the COVID-19 policy. Doc. 46-2, at 42, 50-51; Tr. of Oral Arg. at 9-10. They represent that these services were also offered to Butler. <u>Id.</u> Butler provided no other evidence to the Court beside bald assertions that group activities were taking place at NCP during the COVID-19 restrictions. <u>See</u> <u>Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.</u> 998 F.2d 1224, 1230 (3d Cir.

---

<u>Program to Reprieve Sentences of Incarceration</u> (Sept. 19, 2024))
https://www.media.pa.gov/Pages/corrections_details.aspx?newsid=458 (addressing overcrowding in prisons to reduce the spread of COVID-19).

1993) ("Where the movant has produced evidence in support of its motion for summary judgment, the nonmovant cannot rest on the allegations of pleadings and must do more than create some metaphysical doubt.").

The Court finds that the COVID-19 policy was implemented for the purpose of preventing the spread of COVID-19 and Defendants enforced the prohibition on all group activities as means to prevent the spread of COVID-19.  Thus, the policy's prohibition of group gatherings is rationally related to reducing the spread of COVID-19, in an attempt to protect the health and safety of the inmates, a legitimate penological interest.  See Azcona v. Ellis, No. 20-8526, 2021 WL 1139843, at *2 (D.N.J. Mar. 25, 2021) (finding quarantining a COVID-19 positive detainee "a legitimate response to an unprecedented situation, undertaken to prevent further spread of the virus").  Accordingly, this factor weighs in Defendants' favor.

The second factor, whether there are alternative means/other avenues of exercising the right that remained open to prison inmates, also weighs in Defendants' favor.  Defendants have demonstrated, and Plaintiff agrees, that during the COVID-19 restrictions inmates were allowed to pray in their cells and practice all other forms of worship, except for group prayer.  Doc. 46-2, at 3, 25, 51.  All parties agree there were no restrictions on religious materials, for example, prayer rugs, Qurans, and Kufis.  Id. at 3, 23-25, 51.  Further, one-on-one religious services were allowed provided they maintained COVID-19 safety protocols.[10]  Id. at 44, 51.  Thus, there were

---

[10] Plaintiff argues that one-on-one services were not available because Defendants failed to secure an Imam that was willing to provide services.  Doc. 49, at 3.  Plaintiff further alleges that Defendants did not attempt to secure an Imam to provide services.  Id.  Plaintiff's argument is factually untrue and irrelevant to this factor's analysis.  Defendants have submitted four emails demonstrating Defendant Gephardt's attempts to secure an Imam for religious services, which included the Imam Butler recommended to Defendant Gephardt.  Doc. 46-2, at 56-59.  Plaintiff conceded at oral argument that the emails show Defendant Gephardt did attempt to secure an Imam and that Plaintiff has no proof that Defendant Gephardt did not attempt to secure an Imam.  Tr. of Oral Arg. at 29-30.  Regardless of whether one-on-one services were available, Plaintiff

13

other means and avenues of expression available to Plaintiff during the COVID-19 restrictions. See O'Lone, 482 U.S. at 351-52 (holding a regulation that prohibited inmates from attending Jumu'ah for security reasons did not infringe on inmates' religious freedom rights because inmates were not deprived of all forms of religious exercise); see Turner, 482 U.S. at 92 (noting a regulation that does not deprive prisoners of all means of expression does not infringe on inmates' rights). Therefore, this factor also weighs in Defendants' favor.

Factor three, the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally, also weighs in Defendants' favor. Defendants rely on similar reasoning they proffered for factor one and argue that group activities would expose other inmates and guards to a potentially fatal illness. Doc. 46-3, at 11. Simply stated, Defendants claim the accommodation of Jumu'ah, group prayer, would place other inmates and guards at risk of COVID-19 infection. See CDC supra notes 8-9. Plaintiff has not provided any evidence that group events would not increase the risk of COVID-19 infection. Plaintiff represented at oral argument that he was previously held in a prison that allowed Jumu'ah services, but the prison required inmates to wear masks. Tr. of Oral Arg. at 33. Plaintiff, however, has not provided any proof that group prayer did not increase the risk of exposure to others involved in facilitating the service or that NCP had the same capability as Plaintiff's previous prison. See Turner, 482 U.S. at 90 ("When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."). Thus, again this factor weighs in Defendants' favor.

---

had other forms of expression available to him. See Turner, 482 U.S. at 92 (noting regulation that does not deprive prisoners of all means of expression does not infringe on inmates' rights).

Finally, factor four, the absence of ready alternatives, also weighs in Defendants' favor. Due to the viral nature of COVID-19 and the close quarters faced by inmates, inmates were particularly susceptible to infection.  See CDC supra notes 8-9; Doc. 46-2, at 43.  Plaintiff admitted that he tested positive for COVID-19 during his incarceration.  Tr. of Oral Arg. at 32. As explained previously, there is no equivalent alternative for Jumu'ah services.  Furthermore, it is clear to the Court that no alternative was available to prevent the spread of COVID-19 besides reducing close contact between individuals and droplet transmission that could occur during group activities.  See O'Lone, 482 U.S. at 351 (there is no alternative to Jumu'ah services); See CDC supra notes 8-9.  This factor weighs in Defendants' favor.

Overall, for the reasons explained above, the Turner factors weigh in Defendants' favor. Plaintiff failed to present any evidence to dispute the fact that Defendants chose to implement the COVID-19 policy for the health and safety of inmates, a valid governmental interest, and that the policy was rationally related to that legitimate governmental interest.  Thus, Defendants' COVID-19 regulation did not run afoul of Plaintiff's First Amendment right.  Defendants' request to dismiss Plaintiff's First Amendment and Fourteenth Amendment claim with prejudice is GRANTED.[11]

---

[11] Plaintiff's Equal Protection claim fails for similar reasons.  To succeed on an Equal Protection claim, an inmate must prove that the difference between the defendants' treatment of the inmate and another inmate was not "reasonably related to a legitimate penological interest."  DeHart v. Horn, 227 F.3d 47, 61 (2000) (citing Clark v. Grosse, 36 F.3d 770, 773 (8th Cir. 1994); O'Lone, 482 U.S. at 349; Turner, 482 U.S. at 86-87.  As previously discussed in the section addressing Plaintiff's First Amendment claim, the COVID-19 regulation is reasonably related to a legitimate penological interest.  Additionally, Plaintiff's Equal Protection claim fails because Plaintiff has failed to prove purposeful discrimination in the policy's application.  See supra pp. 10-12 (noting NCP did not allow any group activities during Butler's incarceration); see also supra note 10 (noting if groups were allowed, NCP could not secure an Imam to provide services); see Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 151 (3d Cir. 2005) (holding for Equal Protection purposes a plaintiff must show they received different treatment from that received by other individuals similarly situated).

**D.  Religious Land Use and Institutionalized Persons Act (RLUIPA)**

RLUIPA prohibits a state or local government from taking any action that substantially burdens the religious exercise of an institutionalized person unless the government demonstrates that the action constitutes the least restrictive means of furthering a compelling governmental interest.  42 U.S.C. § 2000cc; Holt v. Hobbs, 574 U.S. 352, 356 (2015).  The claimant bears the initial burden of proving his or her request for accommodation is based on a sincerely held religious belief and that the regulation substantially burdens his or her religious exercise.  Holt, 574 U.S. at 360-61.  A regulation that requires the petitioner to "engage in conduct that seriously violates [the plaintiff's] religious beliefs" and choose between religious practice and consequence is a substantial burden on his or her religious exercise.  Id. at 361 (citing Burnwell v. Hobby Lobby Stors, Inc., 573 U.S. 682, 720 (2014)).

After the claimant has established an impingement on his or her right, the burden shifts to the defendant to show that the regulation was in furtherance of a compelling governmental interest and was the least restrictive means of furthering that compelling interest.  Id. at 362.  RLUIPA requires the government to demonstrate that the compelling interest is satisfied through application of the challenged law to the person whose sincere exercise of religion is being substantially burdened.  Id. at 363 (citing Hobby Lobby Stores, Inc., 573 U.S. at 726-727).  "The least restrictive means standard is exceptionally demanding" and it requires the government to "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]."  Holt, 574 U.S. at 364-65 (citing Hobby Lobby Stores, Inc., 573 U.S. at 728).  "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 815 (2000).

16

Here, Plaintiff's RLUIPA claim is now moot.  This Court previously limited Plaintiff's relief under RLUIPA to injunctive relief only.  Butler, 2022 WL 4473590, at *6.  Butler was incarcerated when he filed the complaint and at the time of this Court's September 26, 2022 decision.  Doc. 5.  Butler, however, was subsequently released in November 2022.  Tr. of Oral Arg. at 5, 32.

The mootness doctrine ensures that a litigant has interest in the outcome of the lawsuit and is concerned with the court's ability to grant effective relief.  Hamilton v. Bromley, 862 F.3d 329, 335 (3d Cir. 2017).  Federal courts may only adjudicate actual ongoing cases or controversies.  Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990).  A case becomes moot if, during the course of litigation, a development occurs that eliminates the plaintiff's personal stake in the outcome of the case or prevents a court from granting the requested relief.  Hamilton, 862 F.3d at 335 (citing Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 698-99 (3d Cir 1996)).  As applied to inmates who request injunctive relief, a transfer from the facility complained about generally removes the ability for a court to grant the requested relief.  See Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003).  Here, since Plaintiff's RLUIPA claim has been limited to injunctive relief only, which restricted the available relief to reinstating Jumu'ah services at NCP and Plaintiff has since been released from NCP, the Court has no relief it can grant Plaintiff based on his RLUIPA claim.  Accordingly, Plaintiff's RLUIPA claim is moot and is hereby dismissed on those grounds.[12]

---

[12] Nonetheless, mootness will not bar consideration if "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." Lewis v. Cont'l Bank Corp., 494 U.S. 472, 481 (1990) (quoting Murphy v. Hunt, 455 U.S. 478, 482 (1982)).  Plaintiff does not argue that the mootness exception applies.  Moreover, Defendants have represented that the COVID-19 restriction subject to this suit has been lifted

**IV.** **CONCLUSION**

The Court finds that Defendants' COVID-19 policy did not infringe on Plaintiff's First or Fourteenth Amendment rights.  In addition, the Court finds that no constitutional violation occurred, and Defendant Penchishen was not involved in religious service coordination, as such, Plaintiff's § 1983 claim and § 1983 respondeat superior claim fail.  Further, the relief Plaintiff sought and could have received through his RILUPA claim is now unavailable, rendering his claim moot.  Defendants' Motion for Summary Judgment is hereby **GRANTED,** and all claims are dismissed with prejudice.  An appropriate order will follow.


BY THE COURT:

/s/ Craig M. Straw
CRAIG M. STRAW
U.S. Magistrate Judge

---

and religious services have been reinstated so it is unlikely that Plaintiff will be subjected to the same action again.  Tr. of Oral Arg. at 6-7.